**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **HAKIM SIMS,** | Civ. No. 12-cv-2961 (KM) |
|               **Plaintiff,** | |
| **v.** | **OPINION** |
| **CITY OF ORANGE, MAYOR ELDRIDGE HAWKINS, JR. (Individually and in his official capacity as the Mayor of the City of Orange), and POLICE DIRECTOR JOHN E. RAPPAPORT (Individually and in his official capacity as the Police Director of the City of Orange)** | |
|               **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiff Hakim Sims, a police officer employed by the City of Orange Police Department, commenced this action against the City of Orange (the "City"), its former mayor, Eldridge Hawkins, Jr. ("Hawkins"), and its former police director, John E. Rappaport ("Rappaport"). Sims alleges that he was unlawfully punished for speech protected under the First Amendment. His Complaint asserts against all defendants claims under the Conscientious Employee Protection Act (Count I), the New Jersey Civil Rights Act (Count II), and 42 U.S.C. § 1983 (Count III). Now before the Court are the defendants' motions for summary judgment. For the reasons set forth below, the motion filed by the City and Hawkins (Dkt. No. 24-1) is granted in part and denied in part, and the motion filed by Rappaport (Dkt. No. 23-4) is granted. In short, this case will be permitted to go forward against the City and Hawkins on Counts II and III, which allege First Amendment retaliation under the federal and State civil rights statutes.

1

There is less to this case than meets the eye, however. All claims against defendant Rappaport have been voluntarily dismissed; the only defendants remaining are the City and Hawkins. Count I has been voluntarily dismissed; the only counts remaining are Counts II and III (First Amendment retaliation under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act). Sims, a police captain, claims that he was not given a required promotion and was further demoted to punish his political speech and affiliations. When the mayoral regime changed in 2012, however, he was retroactively promoted to his former rank, awarded back pay, and reimbursed for fees and costs. Compensatory damages seem to be moot. The complaint does not request injunctive relief (and Sims has in any event been reinstated). Sims may have a residual claim for nominal damages for violation of a constitutional right. He seeks punitive damages, but those are unavailable as a matter of law against the City. The remaining claims have not been fully discussed by the parties, but in practical terms, this action seems to be a standalone quest for punitive damages against defendant Hawkins.

## I.    BACKGROUND

The plaintiff, Hakim Sims, has been employed as a police officer by the City of Orange Police Department ("OPD") since 1989. In 2006, he was promoted to the rank of captain. Defendant Eldridge Hawkins, Jr., was elected Mayor of Orange in May 2008, but was defeated in the next mayoral election in June 2012. Over the course of Hawkins's term as mayor, Sims and Hawkins developed what is fairly described as an increasingly antagonistic relationship.

Background Encounters Between Sims and Hawkins

The two had a run-in in August 2010 when Hawkins visited a shooting range located at the Essex County Police Academy. Hawkins—who previously served as an OPD officer but retired before he was elected mayor—intended to become qualified to use the type of gun issued by the OPD. (Statement of Material Facts by Defendants City of Orange and Eldridge Hawkins, Dkt. No.

2

24-2, ¶5) At the time, Sims was responsible for supervising the range qualification process for OPD officers. Only OPD officers were permitted to use the range and handle OPD-issued weapons. (*Id.* at ¶6) Therefore, because Hawkins was a civilian, Sims objected to his presence, stating that it was not "lawful or appropriate." (*Id.*) That challenge reportedly irritated Hawkins. (Deposition of Hakim Sims, Dkt. No. 24-3, at 12) He insisted that although he was no longer an OPD officer, he was still a sworn auxiliary police officer, and was therefore authorized to use the range. It is unclear whether Hawkins actually used the range that day. In any event, there was no immediate fallout from this dispute. Sims informed defendant Rappaport, the police director, of what had occurred, but did not press the matter any further.

About a month later, in September 2010, Sims again encountered Hawkins at a retirement dinner. (Dkt. No. 24-2, ¶8) Sims had heard that Hawkins was criticizing him, and approached to ask him why. (Dkt. No. 24-3, at 10) Sims suspected that it had to with the incident at the shooting range; Hawkins answered, however, that he was dissatisfied with the performance of the OPD's patrol division, which Sims headed. (Deposition of Eldridge Hawkins, Jr., Dkt. No. 28-4, at 15-16) Hawkins apparently believed that the patrol division's "daily totals"—the number of citations, tickets, and arrests—were too low. (*Id.*; *see also* Deposition of Hakim Sims, Dkt. No. 24-3, at 13) Sims and Hawkins agree that this conversation was conducted professionally and that it ended without incident.

Demotion for Budgetary Reasons

By early 2011, the City was experiencing budgetary problems. To cut salary costs, in January 2011 the City demoted 14 senior police officers— seven sergeants, five lieutenants, and two captains—by one rank. (Dkt. No. 24-2, ¶12) Sims was one of the two captains demoted to lieutenant. (*Id.*) The demotions were designed to be temporary. In November 2011, the City executed an agreement with the Superior Officers Association (the "SOA Agreement"), under which it promised to re-promote all 14 officers, including

3

Sims, to their former rank "on or before June 1, 2012." (Re-Promotion
Agreement, Dkt. No. 28-6, at 2) The SOA Agreement provided that upon re-
promotion, the officers would continue to receive compensation at their
demoted rank for an additional three months. (Dkt. No. 24-2, ¶15) The SOA
Agreement further provided that if the City failed to re-promote an officer on or
before June 1, 2012, the officer would be entitled to back pay as if he or she
had been re-promoted. (Dkt. No. 28-6, at 3)

<u>Sims's Altercation with Hawkins</u>

In the fall of 2011, Duane Warren announced his intention to run for
Mayor of Orange. Sims, angry about his demotion and other issues regarding
Hawkins's management of the OPD, decided to support Warren's candidacy.
(Deposition of Hakim Sims, Dkt. No. 24-3, at 23) In November 2011, he
attended a fundraiser that marked the start of Warren's campaign. (Dkt. No.
24-2, ¶22)

Word of Sims's support for Warren reached Hawkins. On February 6,
2012, Hawkins told Keith Jackson, the head of the Superior Officer's
Association, that he knew Sims was supporting Warren's candidacy. According
to Sims, Hawkins also told Jackson that, as a result, he would not re-promote
him to the rank of captain. Hawkins denies that part of the conversation. (Dkt.
No. 28-20, at 14-15)

On February 7, 2012, the day after Hawkins's conversation with
Jackson, Sims attended a ceremony at the City of Orange Municipal Courtroom
to celebrate the promotion of a group of sergeants to the rank of lieutenant.[1]
(Dkt. No. 24-2, ¶26) Sims was off-duty at the time and wore plain clothes. After
the ceremony, Hawkins proceeded to shake hands with the attendees. Hawkins
attempted to shake Sims's hand, but Sims refused. (Statement of Material
Facts by Plaintiff Hakim Sims, Dkt. No. 28-1, ¶2) Hawkins asked why Sims
would not shake his hand. Sims responded that he had heard that Hawkins

---

[1]   These promotions were unrelated to the re-promotions the city agreed to in the
SOA Agreement.

was not going to re-promote him, based on Sims's support for Warren. (*Id.*) Hawkins then told Sims: "You're right. In corporate America when you go against the grain, this is what happens." (*Id.*) Hawkins does not deny making this comment, but contends that he was merely referring to Sims's performance as head of the patrol division. (*See* Dkt. No. 28-20, at 20) Hawkins also maintains that he told Sims that he was obligated by the SOA Agreement to re-promote him, whether or not he supported Hawkins's administration.

The parties disagree on what happened next. Each asserts that the other became physically confrontational. Sims says that he attempted to walk away but that Hawkins followed him, approached him aggressively, and demanded that he salute him and show "respect." (Deposition of Hakim Sims, Dkt. No. 24-3, at 16) Hawkins admits that he asked Sims to salute him, but insists that he did so in a calm and non-threatening way; he says Sims escalated things by repeatedly yelling that he would "do what he wanted," and "chest bump[ing]" him in front of the crowd. (Deposition of Eldridge Hawkins, Jr., Dkt. No. 28-20, at 65-66) Ultimately, Sims and Hawkins were separated by onlookers and Hawkins left the courtroom.

Later that same day, Hawkins sent Rappaport a memorandum ordering him to initiate disciplinary proceedings against Sims. The memorandum depicts Sims as the aggressor and concludes thus:

> As the chief executive officer of this City I am appalled at the disorderly and disruptive conduct of this officer. His public display and outburst is embarrassing to this department and most certainly violates a whole host of rules and regulations. Further, if he would exercise such poor judgment by showing such public disrespect and aggressive behavior towards a public official then there is no question that he could conduct himself inappropriately when interacting with others or more specifically the residents whom we all ultimately serve. I am ordering you to refer this matter to internal affairs for swift and immediate disciplinary action.

(Hawkins Memorandum, Feb. 7, 2012, Dkt. No. 28-9, at 3)

Rappaport heeded Hawkins's order. The next day, Sims received a Preliminary Notice of Disciplinary Action ("PNDA") charging him with simple

assault, insubordination, conducting unbecoming, and other infractions under the OPD's internal rules. (Dkt. No. 28-1, ¶4; *see also* PNDA, Dkt. No. 28-7, at 2) Sims was also suspended without pay on the grounds that his "presence constitutes a hazard and danger." (Dkt. No. 28-7, at 2)

Following a hearing on March 12, 2012, at which both sides presented testimony, all charges except the assault charge were sustained. In particular, the hearing officer found that "[t]here was no testimony suggesting that Mayor Hawkins had displayed any public animosity towards [Sims]" and that the City had "sustained its burden in demonstrating that Lt. Sims was insubordinate and engaged in conduct that was unbecoming." (Dkt. No. 24-2, ¶35) The hearing officer ultimately recommended a 120-day suspension without pay. (*Id.* at ¶34)

Hawkins contends that, as mayor, he had the final authority to set the terms of Sims's punishment. In addition to the suspension ordered by the hearing officer, Hawkins ordered that Sims be demoted from lieutenant to sergeant. Hawkins testified at his deposition that "no matter what the hearing officer's decision was, I was going to do what I felt was appropriate under the circumstances." (Dkt. No. 28-4, at 28). A Final Notice of Disciplinary Action ("FNDA"), issued May 7, 2012, memorialized the resolution of the disciplinary action. The demotion meant that Sims, now two grades below the rank of captain, was ineligible to be re-promoted to captain under the SOA Agreement.

Sims alleges that a host of procedural irregularities tainted the disciplinary action against him. He maintains that at every stage of the action—from the issuance of the PNDA, to the selection of the hearing officer, to the decision regarding his final punishment—the OPD failed to follow its own Policy and Procedures for Internal Affairs. He also points to a conflict of interest: the Mayor, who was the complainant, also ordered the disciplinary action and imposed the punishment. Sims alleges that the entire process was driven or unduly influenced by Hawkins's desire to retaliate against him.

<u>This Action</u>

Sims commenced this action on May 17, 2012. The complaint asserts claims against the City, Hawkins, and Rappaport under the New Jersey Conscientious Employee Protection Act (Count I), the New Jersey Civil Rights Act (Count II), and 42 U.S.C. § 1983 (Count III). Sims contends that his support of Warren's candidacy and his refusal to shake Hawkins's hand constituted expressive conduct under the First Amendment. The essence of his Complaint is that the defendants unlawfully retaliated against him for engaging in this constitutionally protected activity by bringing the disciplinary action against him and demoting him to sergeant. Sims seeks compensatory damages for economic harm, interest, punitive damages, and attorney fees and costs.[2]

In June 2012, Warren defeated Hawkins in the mayoral election. The change in leadership brought a change in Sims's fortunes. On July 6, 2012, the City executed a settlement agreement ("Settlement Agreement") with Sims which dismissed "all charges referenced and/or identified in the PNDA and/or FNDA." (Settlement Agreement, Dkt. No. 28-22, at 3) The Settlement Agreement also re-promoted Sims to the rank of captain, reimbursed him for "all back pay and benefits not received as a result of the suspension," and provided for attorney costs. (*Id.*) The Settlement Agreement did not, however, waive or otherwise release the claims asserted here.

Before the Court are motions for summary judgment on behalf of all defendants. Sims states in his combined opposition brief that he is dropping Count I of his Complaint, as well as all claims asserted against Rappaport. (*See* Brief On Behalf Of Plaintiff, Hakim Sims, In Opposition to Defendants' Motion for Summary Judgment, Dkt. No. 28, 9 n. 1) Accordingly, I will grant Rappaport's motion for summary judgment, and grant the motions of all

---

[2]      Sims also seeks damages for "emotional distress." (Complaint, Dkt. No. 1, at 9) The Complaint, however, does not assert an actual claim for either intentional or negligent infliction of emotional distress. The defendants argue that, in any event, Sims could not assert such claims because he has failed to comply with the notice provision of the New Jersey Tort Claims Act. *See* N.J.S.A. 59:8-8. Sims does not contest this argument. I will therefore assume Sims has abandoned any claim for damages relating to "emotional distress."

defendants as to the voluntarily withdrawn Count I. The rest of this opinion will consider only the remaining claims—Counts II and III—against Hawkins and the City. "Defendants," as used in the remainder of this Opinion, shall refer to them only.

## II.   JURISDICTION

This Court has jurisdiction over Sims's federal-law claim under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1331. It has supplemental jurisdiction over his state-law statutory claims pursuant to 28 U.S.C. § 1367.

## III.   SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.,* 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania,* 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. In all cases, the ultimate question is "whether a jury could reasonably find either that Sims proved his case by the quality and quantity of evidence required by the governing law or that he did not." *Anderson,* 477 U.S. at 254.

If the moving party meets its threshold burden, the opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson,* 477 U.S. at 248; *see also* FED. R. CIV. P. 56(c) (setting forth

8

types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial.").

## IV.   ANALYSIS

### A. The Claims for Compensatory Damages, as well as Certain Fees and Costs, Have Been Mooted By the Settlement Agreement

Although the defendants have not raised the issue, I must consider whether, or to what extent, Sims's Settlement Agreement with the City moots the Court's ability to grant the requested relief. *See* p.7, *supra.*

The court's ability to grant effective relief lies at the heart of the mootness doctrine. *County of Morris v. Nationalist Mvmt.*, 273 F.3d 527, 533 (3d Cir. 2001). A case is moot when "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). That is, "[i]f developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot." *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698–699 (3d Cir. 1996). Conversely, the availability of damages or other monetary relief "almost always avoids mootness." *Jersey Cent. Power & Light Co. v. New Jersey*, 772 F.2d 35, 41 (3d Cir.1985) ("Damages should be denied on the merits, not on the grounds of mootness."). Where only some of the issues presented become moot, "the remaining live issues supply the constitutional requirement of a case or controversy." *Powell*, 395 U.S. at 497.

The Settlement Agreement moots Sims's prayer for damages for the economic loss he experienced as a result of the alleged unlawful disciplinary

9

action. It expunged the disciplinary charges from Sims's personnel file, reinstated him to active duty, re-promoted him to the rank of captain, and made the promotion retroactively effective as of February 10, 2012—nearly four months before he was required to be re-promoted under the SOA Agreement. (Dkt. No. 28-22, ¶¶2-3) It also required the City to reimburse Sims for the income he lost while he was suspended without pay.[3] In sum, then, the Settlement Agreement has returned Sims to the status quo *ante,* and then some.[4] Because he has been made whole, Sims's claims are moot insofar as they seek compensatory damages. The Settlement Agreement also ordered the City to pay Sims's legal fees and costs pursuant to N.J.S.A. 40A:14-155. (Dkt. No. 28-22, ¶4) Accordingly, I further find that Sims's claims are moot to the extent they seek fees and costs which have already been recovered.

Sims's claims are not moot, however, insofar as they seek other forms of relief that were not awarded in the Settlement Agreement. These may include nominal damages for any violation of federal civil rights itself. *See Farrar v. Hobby,* 506 U.S. 103, 112 (1992); *Carey v. Piphus,* 435 U.S. 247, 266-267 (1978). His claim for punitive damages, too, survives. *See Powell,* 395 U.S. at 497; *see also McCardle v. Haddad*, 131 F.3d 43, 52-53 (2d Cir. 1997) ("A jury may be permitted to award punitive damages in § 1983 action when it finds that defendant's violation of federal law was intentional or when defendant's conduct is shown to be motivated by evil motive or intent, or when it involves

---

[3] This award was calculated based on a lieutenant's salary for the period between February 8, 2012—the day Sims received the PDNA placing him on suspension—and February 10, 2012—the day his promotion to captain was made retroactively effective. (Dkt. No. 28-22. at ¶3) For the period between February 10, 2012 and July 6, 2012—the day the Settlement Agreement was executed and Sims was reinstated to active duty—the award was calculated based on a captain's salary. (*Id.*)

[4] Indeed, Sims has actually fared better under the terms of the Settlement Agreement than he would have had he simply been re-promoted under the SOA Agreement. That agreement, remember, provided that Sims was not required to be re-promoted until June 1, 2012, and that, upon his re-promotion, he would continue to receive a lieutenant's salary for a period of three months. (See Dkt. No. 28-6, at 2). Under the Settlement Agreement, however, Sims was not only re-promoted before June 1st, but also, he was compensated as a captain from the effective date of his re-promotion without having to wait the additional three months to receive his full salary.

reckless or callous indifference to federally protected rights of others.") There may be others; for present purposes, it suffices that these live claims defeat a mootness challenge.

Having found that the action is not moot, I will consider whether Sims's claims withstand summary judgment.

## B. Liability of the City of Orange Under Section 1983

It is well established that municipal liability under Section 1983 "may not be proven under the *respondeat superior* doctrine, but must be founded upon evidence that the government unit itself supported a violation of constitutional rights." *Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir. 1990) (citing *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658 (1978)). As a consequence, a municipality may be liable under Section 1983 only where the constitutional injury is alleged to have been caused by a municipal "policy" or "custom". *See Monell,* 436 U.S. at 694. A municipal policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1480 (3d Cir. 1990) (internal quotations omitted). A municipal custom may be shown where a course of conduct, though not authorized by law, is "so permanent and well-settled as to virtually constitute law." *Id.*

The disciplinary action taken against Sims is fairly characterized as the act of the municipality itself. It amounts to a municipal policy. Hawkins, the Mayor, ordered Rappaport, the police director, to initiate the allegedly unlawful disciplinary action. Hawkins deliberately influenced the final resolution of that action by ordering Sims to be demoted to sergeant. Hawkins' decisions were made pursuant to his authority as mayor of the City, and the City is responsible. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 481 (1986) ("If the decision to adopt [a] particular course of action is properly made by that government's authorized decisionmaker[], it surely represents an act of official government 'policy' as that term is commonly understood...[T]he municipality

11

is equally responsible whether that action is to be taken only once or to be taken repeatedly.")

The City's motion for summary judgment on *Monell* grounds is therefore denied.

I will grant summary judgment, however, as to the claim for punitive damages, one of the few remaining in the case. Even though the City is liable under Section 1983, it is immune from liability for punitive damages. *See, e.g., City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 268 (1981) ("[T]he deterrence rationale of § 1983 does not justify making punitive damages available against municipalities."); *Keenan v. City of Philadelphia,* 983 F.2d 459, 464 (3d Cir. 1992) ("[J]uries cannot impose punitive damages directly against municipalities under 42 U.S.C. § 1983.").

## C. The Retaliation Claim Under Section 1983

A First Amendment retaliation claim has three essential elements:

(1) The plaintiff's speech was protected under the First Amendment;

(2) The defendant took an adverse or retaliatory action; and

(3) A causal connection between (1) and (2), *i.e.,* that the protected speech was a substantial or motivating factor in the retaliatory action, shifting the burden of proof to defendant to demonstrate it would have taken the same action absent the protected speech.

*See Miller v. Mitchell,* 598 F.3d 139, 147 (3d Cir. 2010); *Gorum v. Sessoms,* 561 F.3d 179, 184 (3d Cir. 2009); *Hill v. Borough of Kutztown,* 455 F.3d 225, 241 (3d Cir. 2006); *Rauser v. Horn,* 241 F.3d 330, 333 (3d Cir. 2001). The first element is an issue of law; the second and third are questions of fact. *Baldassare v. New Jersey,* 250 F.3d 188, 195 (3d Cir. 2001); *Johnson v. Lincoln Univ.,* 776 F.2d 443, 454 (3d Cir. 1985); *see also Gorum, supra.*

## 1. Sims's Speech Was Protected by the First Amendment

A person who goes into government service does not give up the First Amendment right to express oneself freely *as a citizen. See Connick v. Myers,* 461 U.S. 138, 142 (1983) But limitations may be placed on the speech of public employees *as employees.* The Supreme Court has clearly stated the reasons for limiting First Amendment protection in the public employee context: first, a citizen in government service accepts certain restrictions on his freedom; second, the government, like any employer, must exercise some control over employees' words and actions; and third, a public employee is in a position of public trust, and cannot be permitted to express views that "contravene governmental policies or impair the proper performance of governmental functions." *Garcetti v. Ceballos,* 547 U.S. 410, 418-19 (2006).

A statement made by a public employee, then, is protected by the First Amendment only when, "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have an 'adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." *Hill v. Borough of Kutztown,* 455 F.3d 225, 241 (3d Cir. 2006) (quoting *Garcetti,* 547 U.S. at 418); *accord Montone v. City of Jersey City,* 709 F.3d 181, 193 (3d Cir. 2013).

I will analyze Sims's acts and statements under those three *Garcetti* factors.

### a. Support for Warren's Candidacy

Sims's support for Warren's candidacy undoubtedly is protected by the First Amendment guarantees of free speech and freedom of association. It requires no extended analysis.

"Political expression in support of a candidate and/or his policies is at the heart of the first amendment and is entitled to constitutional protection as it involves a matter of public concern." *Perez v. Cucci,* 725 F. Supp. 209, 234

13

(D.N.J. 1989) (surveying Supreme Court case law); *see also Ferraioli v. City of Hackensack Police Dep't*, 2010 U.S. Dist. LEXIS 8527 at *22 (D.N.J. July 29, 2009) (freedom of association encompasses the right to maintain a political affiliation). Moreover, it cannot be said that Sims's support for Hawkins's opponent so threatened the OPD's operations that he could be treated differently from an ordinary member of the public. *Garcetti*, 547 U.S. at 418; *see also Montone*, 709 F.3d at 189 (stating that political affiliation is not "an appropriate requirement for the effective performance" of police duties).

The defendants' objection is that "attending a single fundraiser at which he was 'not there that long'" cannot be construed as protected activity. (Dkt. No. 24-1, at 13 (internal citations omitted)) The objection is unsupported in the case law, and it seems to imply an absurd result: that a brief appearance at a fundraiser could be punished and a longer one could not. I find that Sims engaged in a protected First Amendment activity when he supported Warren's candidacy and attended the Warren fundraiser.

### b. Refusal to Shake Hawkins's Hand

When Hawkins attempted to shake Sims's hand at the promotion ceremony, Sims rebuffed him. Sims explained the gesture: he said he had heard that Hawkins would not re-promote him because he was a Warren supporter. Although the issue is debatable, I conclude that Sims's speech here was protected because he communicated in his capacity as a citizen.

Did Sims speak? Clearly his oral statement was a form of expression, and so too was his refusal to shake Hawkins's hand. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984) ("A message may be delivered by conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative."); *accord Texas v. Johnson*, 491 U.S. 397, 404 (1989); *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 160 (3d Cir. 2002).

Did Sims speak "as a citizen"? I think that he did. When Sims performed these expressive acts, he was not discharging any official responsibilities as a police officer. *See Hill*, 455 F.3d at 242 ("A public employee does not speak as a citizen when he makes a statement pursuant to [his] official duties.") (internal quotations omitted). Sims was not required to attend this ceremony. He was off-duty, and out of uniform. His expressive acts would not reasonably be attributed to the police department or the City. It gives me pause that he was complaining to the mayor about a job-related matter; "complaints up the chain of command about issues related to an employee's workplace duties—for example, possible safety issues or misconduct by other employees—are within an employee's official duties" and therefore unprotected. *Morris v. Philadelphia Hous. Auth.*, 487 Fed. App'x 37 (3d Cir. 2012) (non-precedential) (holding that plaintiff's reporting instances of potential misconduct of subordinates to his superiors was within his official job duties); *Foraker v. Chaffinch*, 501 F.3d 231, 240 (3d Cir. 2007), *abrogated on other grounds by Borough of Duryea, Pa. v. Guarnieri*, 131 S. Ct. 2488 (2011) ("Price and Warren were acting within their job duties when they expressed their concerns up the chain of command...."); *Hill*, 455 F.3d at 242 (a town borough manager's reports to his superiors about harassment by the town mayor were not protected speech because his reports were made pursuant to his managerial duties)). Yet I think this situation is distinguishable. Sims was not discharging a public duty to keep his superiors in the police department informed. Rather, he voiced his concerns directly to an elected official, the mayor, whom he accused of subverting the command structure on political grounds. That sounds more like a citizen protest than an employee's report to his boss.

Did Sims speak on a matter of "public concern"? Again, I believe so. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). The notion of "public concern" is a broad one, which incorporates many values; it is

15

not a bright-line rule. The underlying principle is that the speech in question must benefit the process of self-government or facilitate informed decision-making by the electorate. *See, e.g., Connick*, 461 U.S. at 145; *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 570 (1968); *Azzaro v. County of Allegheny*, 110 F.3d 968, 977 (3d Cir. 1997). Such speech includes statements concerning "actual or potential wrongdoing or breach of public trust on the part of [an elected official]" that would be relevant in evaluating that official's performance. *Connick*, 461 U.S. at 148. Speech relating to a public concern "is not limited to public declarations"; it may be "implicated in private exchanges between two individuals" where the message conveyed, if disseminated to the community, "would be relevant to the process of self-governance." *Azzaro*, 110 F.3d at 977 (quoting *Connick*, 461 U.S. at 146, 148).

Here, Sims remonstrated with the mayor and accused him of politicizing his re-promotion. Hawkins then confirmed his suspicions by replying: "You're right. In corporate America when you go against the grain, this is what happens." Sims, then, was not merely protesting a personnel decision, but accusing Hawkins of abusing his office. The citizens of Orange might well have found that information to be of "instrumental value...in enabling [their] self-governance." *Azzaro*, 110 F.3d at 977. Whether their elected mayor reneged on an agreement with a top police official as a form of political payback would be germane to their evaluation of his performance. I therefore find that Sims's speech involved a matter of public concern.

Finally, did the circumstances justify the OPD in treating Sims differently from a member of the general public who had uttered the same words? To answer that question, the Court must weigh "the interest of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [public employer], in promoting efficiency of the public services it performs through its employee." *Montone*, 709 F.3d at 195-96. The defendants argue that the City has an interest in maintaining discipline. By refusing to shake

16

Hawkins's hand or salute him, they claim Sims committed "a willful act of insubordination" that made him "subject to discipline under the Orange Police Department Rules and Regulations." (Dkt. No. 31, at 2) As Sims points out, however, there is no OPD rule or regulation that requires an off-duty police officer to shake hands with the mayor. (*See* Dkt. No. 28, at 27-28)[5] There is no indication in the record that Sims's speech "was designed to incite, nor did it encourage or urge fellow officers to disobey superiors' orders or otherwise do anything that would negatively affect the internal order and discipline of the police department." *Carter v. City of Melbourne, Fla.*, 731 F.3d 1161, 1169 (11th Cir. 2013) While the City and the OPD certainly have a valid interest in preventing insubordination, this interest was not compromised by Sims's off-duty speech.

Sims has met the first element of a retaliation claim: his attendance at the Warren fundraiser and his expressive words and acts in the hand-shaking incident are protected by the First Amendment.

### 2. Sims's Protected Speech Was a Substantial or Motivating Factor in the Alleged Retaliatory Action

I must now determine whether Sims's protected First Amendment activity was a "substantial or motivating factor" in the alleged retaliation against him. *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002) That is, a plaintiff need not demonstrate that retaliation was the only reason for his wrongful discharge or demotion; he need only show that it was either a substantial or a motivating factor. *See generally* 22 AM. JUR. 3D *Termination or Demotion of Public Employee In Relation For Speaking Out As a Violation of Right of Free Speech* § 16 (1993).

---

[5]     I here hold only that Sims's speech merits First Amendment protection, so that retaliation, if proven, would be actionable. Hawkins alleges that Sims escalated the situation to a chest-bumping confrontation. That, if proven, might help persuade a jury that the discipline was justified, and not retaliatory. According to Sims and his witnesses, however, it was Hawkins who turned a conversation into a scene.

17

Cases considering causation often begin with temporal proximity. Where the adverse action closely follows the protected speech, for example, a causal link may be inferred. *See Kachmar v. Sungard Data Sys.*, 109 F.3d 173, 177 (3d Cir. 1997). But that is not the only acceptable proof. Other evidence in the record, "looked at as a whole, may suffice to raise the inference" of causation. *Campbell v. Abercrombie & Fitch, Co.*, 2005 WL 1387645, at *7 (3d Cir. June 9, 2005). Ultimately, there are "no limits" on the type of evidence a court may consider when assessing whether a plaintff has demonstrated causality. *Id.* (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000))

Here, the circumstantial evidence proffered by Sims is sufficient to permit a trier of fact to conclude that his protected speech was a substantial or motivating factor for the disciplinary action taken against him.

Hawkins, of course, knew that Sims was supporting Warren in the upcoming mayoral election. *See Ambrose*, 303 F.3d at 493 ("for protective conduct to be a substantial or motivating factor in a decision, the decision-makers must be aware of the protected conduct.") Sergeant Jackson, the head of the Superior Officers Association, testified in the disciplinary hearing that Hawkins sought to delay re-promoting Sims until June 1st, 2012, the latest day permitted under the SOA Agreement, at least in part for political reasons: "[T]he Mayor...made statements about [Sims] to me, you know, I don't care for [Sims], and plus he supports another candidate." (Dkt. No. 28-20, at 41) When Sims confronted Hawkins with the knowledge that he was being punished for supporting Warren, Hawkins responded that "when you go against the grain, this is what happens." Drawing inferences in Sims's favor for purposes of this motion, I must credit Sims's retaliatory interpretation, not Hawkins's innocent interpretation, of that statement.

Sims cites evidence that the charges of insubordination were trumped up. Three officers who witnessed the confrontation—Lieutenant Soto, Sergeant Coley, and Sergeant Hamm—submitted contemporaneous reports stating that it was Hawkins who became aggressive and belligerent while Sims exercised

restraint and showed respect. (*See* Dkt. Nos. 28-16, 28-13, 28-17) This
evidence, if believed, would tend to rebut Hawkins's position that discipline
was imposed for neutral, legitimate reasons.

Sims's evidence suggests that Hawkins took an unseemly personal
interest in his disciplinary proceedings. The charges, he says, were pushed by
Hawkins, as evidenced by the authorities' failure to comply with the OPD's
Policy and Procedures for Internal Affairs (the "I.A. Rules"). Those rules
required the officer investigating the complaint to interview the complainant
and the subject officer, but neither was interviewed. The rules also required
that the investigating officer submit an "Investigation Report" identifying all the
"investigative activity" and a "Summary Report" recommending "dispositions for
each allegation." (Dkt. No. 28-8, at 10) The reports are supposed to be
forwarded to the Police Director for review, but Rappaport testified that he
never saw either report and does not believe they exist. (*See* Deposition of
Director Rappaport, Dkt. No. 28-5, 89:19 to 90:16) A PNDA was nevertheless
issued. Rappaport understood that Hawkins was ordering him to sign it. (*Id.* at
75:7-76:28) The PNDA placed Sims on immediate suspension, which made him
ineligible for re-promotion until the charges against him were resolved.

The I.A. Rules state that a disciplinary hearing shall be held "before the
Director or the Director's designee." (Dkt. No. 28-8, at 12) But neither
Rappaport nor his designee presided over the March 13, 2012 hearing.
According to Rappaport, the hearing officer was selected by "City Hall." (Dkt.
No. 28-5, at 130:12-15) The I.A. Rules also make no reference to the mayor's
ability to enhance or otherwise modify a punishment. Yet Hawkins did just
that. The hearing officer imposed a 120-day suspension without pay. Hawkins,
however, ordered Sims to be demoted to sergeant, knowing that this would
render him ineligible to be re-promoted to the rank of captain. Hawkins stated
that, regardless of what the hearing officer decided, he was always going to do
what he felt was "appropriate under the circumstances." (Dkt. No. 28-4, at 28)

Based on the foregoing, a trier of fact could reasonably conclude that Sims's constitutionally protected speech activities played a substantial or motivating role in his punishment and demotion.

### 3. The Evidence Reveals Weakness and Inconsistencies in the Defendants' Proffered Legitimate Reasons for Disciplining Sims

Sims having proffered sufficient evidence of retaliation, "the burden shifts to the defendants to demonstrate that the same action would occur if the speech had not occurred." *Green v. Phila. House. Auth.*, 105 F.3d 882, 885 (3d Cir. 1997) Based on the evidence before me, I find that the defendants have failed to discharge that burden.

The defendants argue that "had Sims not engaged in an act of public insubordination in violation of the Department Rules, no investigation would have occurred, no discipline would have ensued, and no demotion would have occurred." (Dkt. No. 31, at 3) There is ample evidence to the contrary. For one thing, there is the punishment of Sims's support for Warren *simpliciter*. As to the handshake incident, Sims's insubordination allegedly consisted of refusing to shake Hawkins's hand and not saluting. However, the defendants point to no OPD rule requiring an officer to shake hands with the mayor. Likewise, although there is a rule requiring officers to salute dignitaries including "The Mayor of the City of Orange," that rule applies only to "[p]olice officers of the department *on duty*." (Memorandum re Saluting and Military Courtesy, Dkt. No. 23-2, 15) (emphasis added). Sims was not on duty. Finally, s described above, Sims has proffered further evidence that the process by which he was disciplined was motivated by Hawkins's desire to punish him for political disloyalty.

Accordingly, the defendants have not shown that the disciplinary action against Sims "would [have] occur[ed] if the speech had not occurred." *Green*, 105 F.3d at 885. This is not to suggest that the action was driven *solely* by Hawkins's desire to retaliate against Sims for his protected First Amendment

activity. It is simply to say Sims has succeeded in creating a triable issue as to the defendants' articulated rationale for punishing him. "Where a reasonable inference can be drawn that an employee's speech *was at least one factor* considered by an employer in deciding whether to take action against the employee, the question of whether the speech was a motivating factor in that determination is best left to the jury." *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 795 (3d Cir. 2000) (emphasis added).

The defendants' motion for summary judgment on Count III, Sims's Section 1983 claim, must therefore be denied.

### D. Retaliation Under the New Jersey Civil Rights Act

Sims also asserts a retaliation claim under the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. 10:6-1. The NJCRA was modeled after Section 1983, and New Jersey courts have consistently looked at claims under the NJCRA "through the lens of § 1983." *Trafton v. City of Woodbury*, 799 F. Supp. 2d. 417, 443-44 (D.N.J. 2011); *see also Chapman v. New Jersey*, 2009 WL 2634888, *3 (D.N.J. Aug. 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart..."). Based on the analysis in Section IV.C., *supra*, I find that Sims has raised a triable issue of fact as to whether he was unlawfully retaliated against under the NJCRA. I will therefore deny the defendants' motion for summary judgment on Sims's NJCRA claim.

## V.   CONCLUSION

For the foregoing reasons, the motion for summary judgment filed by defendant Rappaport is **GRANTED** and the motion for summary judgment filed by defendants Hawkins and the City of Orange is **GRANTED IN PART** and **DENIED IN PART**.

An appropriate Order will issue.

Dated: March 13, 2015

_____

**KEVIN MCNULTY**
**United States District Judge**